IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DAWN MARIE PRUITT, | CASE NO. 4:22-cv-901 |
| Plaintiff, | DISTRICT JUDGE |
| | BENITA Y. PEARSON |
| vs. | |
| | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | JAMES E. GRIMES JR. |
| Defendant. | **REPORT & RECOMMENDATION** |

Plaintiff Dawn Marie Pruitt filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying Supplemental Security Income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). This matter has been referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural history**

In June 2020, Pruitt filed an application for Supplemental Security Income alleging a disability onset date of January 29, 2016,[1] and claiming she was disabled due to depression, anxiety, irritable bowel syndrome, sleep apnea,

---

[1] "Once a finding of disability is made, the ALJ must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

fibromyalgia, high blood pressure, back and neck pain, and anemia. Tr. 187, 221. The Social Security Administration denied Pruitt's application and her motion for reconsideration. Tr. 112, 122. Pruitt then requested a hearing before an Administrative Law Judge (ALJ). Tr. 134.

In February 2021, an ALJ held a hearing. Pruitt and a vocational expert testified. Tr. 32–73. The next month, the ALJ issued a written decision finding that Pruitt was not disabled. Tr. 15–27. The ALJ's decision became final on April 1, 2022, when the Social Security Appeals Council declined further review. Tr. 1–3; *see* 20 C.F.R. § 404.981.

Pruitt filed this action on May 31, 2022. Doc. 1. She asserts the following assignments of error:

> 1. The ALJ erred when she failed to find that the opinion of the treating physician, Dr. James Nichols, was consistent with and supported by the medical evidence, and failed to incorporate the stated limitations in the RFC.
>
> 2. The ALJ erred when she failed to find that the waxing and waning of Pruitt's symptoms would preclude her from engaging in substantial gainful activity on a full-time and sustained basis.
>
> 3. The ALJ erred in her credibility finding when she failed to consider Pruitt's symptoms as required by Social Security Ruling 16-3p.
>
> 4. The ALJ erred in that substantial evidence did not support the RFC finding that Pruitt could perform work at the light level of exertion.

Doc. 9, at 1.

**Evidence**

*1.    Personal and vocational evidence*

Pruitt was born in 1967 and was 53 years old on the day she filed her application. Tr. 25. She finished tenth grade and used to work as a laundry worker at a nursing home. Tr. 42–43.

*2.    Medical evidence[2]*

In August 2019, Pruitt went to the emergency room. Tr. 300. She reported "body wide pain" from a fibromyalgia flare-up. Tr. 300.

In September 2019, Pruitt saw her doctor, James Nichols, D.O., for irritable bowel syndrome. Tr. 662, 666. Pruitt also reported hypertension, fatigue, muscle pain, migraine, neck pain, and back pain. Tr. 662–63. Dr. Nichols's exam findings showed that Pruitt had "increased spasm C1 to T8" with decreased range of motion. Tr. 666. She had normal reflexes, muscle tone, and coordination, and normal psychiatric findings. Tr. 666. Dr. Nichols diagnosed Pruitt with cervical disc herniation at C4/5 and C5/6;[3] benign

---

[2]    The recitation of medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs.

[3]    Vertebrae in a person's spine are given letter and number designations according to their location. The neck—the cervical spine—has 7 vertebrae designated as C1 through C7. *See* https://www.spine-health.com/conditions/spine-anatomy/vertebrae-vertebral-column (last visited Jan. 26, 2023). The 12 vertebrae comprising the upper spine—the thoracic spine—are labeled at T1 through T12. *Id.* The 5 in the lower spine—the lumbar spine—are L1 through L5. *Id.* And the 5 vertebrae at the bottom of the spine—in the sacrum—are labeled as S1 through S5. https://www.spine-health.com/conditions/spine-anatomy/sacrum-sacral-region (last visited Jan. 26, 2023).

essential hypertension; chronic migraine "without aura without status migrainosus, not intractable";[4] fibromyalgia; and status post-anterior cervical discectomy and fusion at C4/5 and C5/6. Tr. 666.

In November 2019, Pruitt saw Jennifer Haaga, Psy.D., for a consultative exam. Tr. 289. Pruitt stated that she lived with her mother and adult son. Tr. 290. Pruitt didn't socialize outside her home. Tr. 290. She typically woke at 4:00 a.m. to drive her son to work. Tr. 291. She smoked marijuana twice a day for pain and anxiety. Tr. 290. She took medication for her physical conditions but didn't use a CPAP machine[5] at night for her sleep apnea "because it [wa]s not that bad yet." Tr. 291. She complained of menopause symptoms; poor sleep from pain, hot flashes, and sleep apnea; and fleeting suicidal ideation. Tr. 292. Pruitt's mental status exam showed that Pruitt was cooperative and had good eye contact, adequate grooming and hygiene, logical thoughts, and clear speech. Tr. 292. She appeared depressed with a congruent mood. Tr. 292. She reported anxiety and Dr. Haaga observed that Pruitt had no motor manifestations of anxiety. Tr. 292. Pruitt said that she had some difficulties

---

[4]    "Status migrainosus is a headache that doesn't respond to usual treatment or lasts longer than 72 hours." *See* https://americanmigrainefoundation.org/resource-library/what-is-status-migrainosus/#:~:text=For%20most%20people%20living%20with,lasts%20longer%20than%2072%20hours (last visited Jan. 26, 2023).

[5]    A CPAP (continuous positive airway pressure) machine is a common treatment for sleep apnea. It keeps a person's airways open while the person sleeps, so he or she can receive oxygen. *See* https://my.clevelandclinic.org/health/treatments/22043-cpap-machine (last visited Jan. 26, 2023).

with memory and Dr. Haaga wrote that she had to remind Pruitt about questions Dr. Haaga asked, but that Pruitt showed no significant difficulties with memory during the evaluation. Tr. 293.

Dr. Haaga diagnosed "persistent depressive disorder, early onset, with anxious distress, with intermittent major depressive episodes" with a moderate current episode; unspecified trauma and stressor related disorder; and unspecified cannabis related disorder. Tr. 294. Dr. Haaga opined that Pruitt's cognitive functioning was in the low average range and that Pruitt's attention and concentration were adequate. Tr. 293. Pruitt was fully oriented and showed adequate judgment, motivation, and common-sense reasoning. Tr. 293. Dr. Haaga concluded that Pruitt was capable of comprehending and completing simple routine tasks, but may have difficulty understanding, remembering, or following instructions for more complex tasks. Tr. 295. Pruitt's symptoms of depression, irritability, and anxiety "will likely cause difficulties" in maintaining attention and concentration and she "appear[ed] to struggle with motivation and avoidance." Tr. 295. Dr. Haaga commented that Pruitt reported "a history of some interpersonal problems with coworkers" and that "she would likely struggle to successfully manage the pressures of a competitive work environment at this time." Tr. 295–96.

In February 2020, Pruitt saw Dr. Nichols for a follow-up. Tr. 655, 659. Pruitt reported abdominal pain, constipation, and diarrhea that started a week prior to the exam. Tr. 655. She was not treating her symptoms. Tr. 655. Her

exam findings were normal. Tr. 658–59. Dr. Nichols assessed chronic fatigue, obstructive sleep apnea, cervical region somatic dysfunction, unspecified-type migraines, lumbar disc disease with radiculopathy, anxiety, abdominal pain, and irritable bowel syndrome. Tr. 660–61.

In early April 2020, Pruitt went to the emergency room for abdominal pain and vomiting. Tr. 323. She reported that previously she had a work-up for this problem—her gallbladder—and was scheduled in June to have her gallbladder removed. Tr. 323. Pruitt was admitted, treated, and discharged a week later. Tr. 332. Pruitt returned to the emergency room at the end of May for the same symptoms. Tr. 476. She was admitted, treated, and discharged 2 days later. Tr. 541–42. A few days after that, Pruitt had gallbladder removal surgery. Tr. 619–20.

In June 2020, Pruitt saw Carmela Kiraly, M.D., for a sleep study due to Pruitt's symptoms of excessive daytime sleepiness, difficulty sleeping, loud snoring, napping, difficulty performing work, waking confused, and "nocturnal choking/gasping." Tr. 644. The study showed mild to moderate obstructive sleep apnea. Tr. 644–65. Dr. Kiraly recommended CPAP therapy. Tr. 645. Pruitt reported that in 2016 she was told she had obstructive sleep apnea but declined CPAP therapy. Tr. 814. In late July 2020, she started CPAP therapy. Tr. 815. At that visit, the provider noted that Pruitt had high blood pressure and Pruitt said that she didn't have time to take her blood pressure medication that day. Tr. 815.

In early August 2020, Pruitt saw Dr. Nichols for blurry vision. Tr. 765, 770. Pruitt also reported fatigue, muscle pain, neck and back pain, and headaches. Tr. 766. Dr. Nichols's exam finding showed that Pruitt had a normal range of motion in her neck, a normal abdominal exam, "increased spasm C1 to T8" with decreased range of motion, and multiple tender points in her "upper and lower extremities [and] trunk." Tr. 769. She had normal neurological and psychiatric findings. Tr. 769. Dr. Nichols referred her to ophthalmology. Tr. 770–71.

In mid-August 2020, Pruitt saw Dr. Haaga for another consultative exam. Tr. 726–33. Pruitt reported facts similar to her prior visit. Tr. 727–29. Dr. Haaga's exam findings showed that Pruitt had adequate grooming and hygiene, fleeting eye contact, and normal speech and thought processes. Tr. 729. She was cooperative and her interaction with Dr. Haaga was adequate. Tr. 729. Pruitt's mood "appeared anxious and somewhat down" with a congruent affect. Tr. 729. Pruitt had "some motor manifestations of anxiety with fidgeting." Tr. 730. Dr. Haaga diagnosed similar conditions as the prior exam, but this time she assessed Pruitt with a then-current mild episode of depressive disorder and added a diagnosis of unspecified personality disorder. Tr. 731. Dr. Haaga found that Pruitt could perform simple, routine, and more complex tasks but might need additional reminders to learn new tasks. Tr. 732. She would have some difficulty maintaining attention and concentration when

demands become too great, difficulty managing conflict or criticism, and problems managing significant work pressure. Tr. 732–33.

In late August 2020, Pruitt had an exam at an ophthalmology clinic. Tr. 736. She reported blurry vision and a floater.[6] Tr. 736. The provider examined Pruitt and assessed her with retinal vein occlusion in the right eye with macular edema. Tr. 741. The provider referred Pruitt to a different office for further evaluation. Tr. 741–42. The next month, Pruitt visited that office and was diagnosed with hypertensive retinopathy and nuclear sclerosis. Tr. 745. The doctor gave Pruitt an injection for her retinal vein occlusion and macular edema. Tr. 745.

In September 2020, Pruitt saw Dr. Nichols for a follow-up for her hypertension, migraine, fatigue, muscle pain, and neck, back and hip pain. Tr. 756, 761. Dr. Nichols's exam findings showed multiple tender points in Pruitt's "upper and lower extremities [and] trunk," increased spasms at C1 to T8 and L1 to S1 with decreased range of motion, and positive straight leg raise tests.[7] Tr. 760. Pruitt's neurological and psychiatric findings were normal. Tr. 760. Pruitt reported a recent fall and her right hip x-rays were normal. Tr. 761, 836.

---

[6]     A floater is a spot in one's vision that looks like a speck and drifts around when one moves one's eyes. *See* https://www.mayoclinic.org/diseases-conditions/eye-floaters/symptoms-causes/syc-20372346 (last visited Jan. 26, 2023).

[7]     In a straight leg-raising test, the patient lies down, fully extends the knee, and lifts the leg. *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1900. Leg pain when raising the leg 30–90 degrees is a positive test and indicates lumbar radiculopathy. *Id*.

Dr. Nichols continued Pruitt's Cymbalta and Neurontin prescriptions for migraines, spinal pain, and fibromyalgia. Tr. 761.

In November 2020, Pruitt had a 3-month follow-up visit for her sleep apnea and CPAP therapy. Tr. 870. She reported that she needed her CPAP mask adjusted because it leaked at night. Tr. 871. She said that it was helping—she slept better at night, stopped taking naps, and didn't feel drowsy while driving. Tr. 871. At that appointment her blood pressure was high. Tr. 872. Pruitt said that she didn't have time to take her blood pressure medication that morning and had consumed an energy drink before the exam. Tr. 871.

Two days later, Pruitt went to Dr. Nichols's office and saw a different doctor. Tr. 930. Pruitt had right hip pain from a fall 2 months prior to the visit. Tr. 930. She reported radiating pain in her lateral hip and buttock and no tingling or numbness. Tr. 930. Her pain was "starting to improve." Tr. 930. Pruitt's exam findings showed normal psychiatric and neurological findings. Tr. 932. Pruitt's right hip exam showed mild tenderness in the right greater trochanteric ridge, no pain with internal or external rotation, and no sacroiliac joint tenderness. Tr. 933.

In December 2020, Pruitt had a follow-up eye exam. Tr. 862. The doctor remarked that Pruitt's branch retinal vein occlusion with macular edema was improving and gave Pruitt another injection. Tr. 862.

In February 2021, Dr. Nichols completed a "fibromyalgia medical source statement" on Pruitt's behalf. Tr. 935. Dr. Nichols listed Pruitt's symptoms,

including chronic fatigue, muscle pain and weakness, "non-restorative sleep," irritable bowel syndrome, numbness and tingling, swelling, depression, and anxiety. Tr. 935. He wrote that in an 8-hour workday, Pruitt could sit for 10 minutes at a time for a total of about 4 hours; stand for 10 minutes at a time for less than 2 hours; and walk every 15 minutes for 5 minutes at a time for a total of less than 2 hours. Tr. 936–37. She could frequently lift less than 10 pounds, occasionally lift 10 pounds, and rarely lift 20 pounds. Tr. 937. She could rarely twist, bend, and climb stairs, and never crouch, squat, or climb ladders. Tr. 937. She could frequently look down and turn her head to the side, occasionally look up, and rarely hold her head in a static position. Tr. 937. Dr. Nichols indicated that Pruitt would be off-task 20 percent of the workday and miss more than 4 days of work per month. Tr. 938.

### 3. *Function reports*

In July 2020, Pruitt completed a function report. Tr. 231–38. She wrote that she can't stand or sit for too long due to pain. Tr. 231. She has blurry vision, forgets "a lot," and gets "fibro-fog" while driving. Tr. 231. She has sleep apnea, which makes her sleep "all the time." Tr. 232. She estimated that she could lift 5 pounds. Tr. 236. She does not handle stress or changes in routine well. Tr. 237. She managed her finances and had problems balancing her account. Tr. 234. She enjoyed watching television and playing games and could do those activities for 3 hours. Tr. 235. She did some yardwork and shopped in

stores for groceries and games. Tr. 234. She had problems getting along with her mother. Tr. 236. She had no problems with personal care. Tr. 232.

In January 2021, Pruitt's mother completed a function report on Pruitt's behalf. Tr. 279. Pruitt's mother reported that Pruitt had nausea, depression, and anxiety. Tr. 279. Pruitt dropped things, experienced severe pain, had memory loss, and was very tired all the time. Tr. 279.

### 4. *State agency opinions*[8]

*Physical*: In August 2020, Mehr Siddiqui, M.D., reviewed Pruitt's record. Regarding Pruitt's physical residual functional capacity (RFC),[9] Dr. Siddiqui adopted an ALJ's RFC finding in connection with Pruitt's prior disability application. Tr. 118. That RFC assessment found that Pruitt can perform light work with postural and environmental limitations. Tr. 92. In October 2020, Dimitri Teague, M.D., reviewed Pruitt's record and adopted Dr. Siddiqui's opinion. Tr. 108–09.

---

[8]     When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[9]     An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

*Mental*:  In August 2020, Jennifer Swain, Psy.D., reviewed Pruitt's record. Regarding Pruitt's mental RFC, Dr. Swain found that Pruitt can concentrate on simple to complex tasks in a slow-paced environment with non-strict production quotas; have minimal public contact and interact with co-workers and supervisors on an occasional and superficial basis; and adapt to infrequent changes with advance notice. Tr. 119–20. In October 2020, Courtney Zeune, Psy.D., reviewed Pruitt's record and adopted Dr. Swain's opinion. Tr. 109–10.

5. *Hearing testimony*

Pruitt, who was represented by counsel, testified at the telephonic administrative hearing held in February 2021. Pruitt stated that she lives with her mother and Pruitt's adult son. Tr. 42. Pruitt has a driver's license and can drive. Tr. 42.

When asked why she is unable to work, Pruitt stated that she always has a lot of pain. Tr. 45. The pain makes her grouchy. Tr. 45. Her hands shake and she often drops things. Tr. 45. Standing for long periods of time—10 to 15 minutes—hurts her back and hips. Tr. 45–46. Sitting for 30 minutes hurts her hips. Tr. 46. She "cannot lift things above [her] head, or it's hard for [her] to lift things." Tr. 45. It's hard for her to hold a gallon of milk. Tr. 45.

For treatment for her back and hip, Pruitt sees Dr. Nichols. Tr. 46–47. Dr. Nichols gives her medication, which helps. Tr. 47. Pre-Covid, Pruitt saw a physical therapist who helped her "muscles and stuff like that." Tr. 46. Because

Pruitt hasn't been to physical therapy for a while, she must request a referral. Tr. 47. She testified that "[H]opefully, [she'll] be going back to see [the physical therapist]." Tr. 47.

Pruitt takes gabapentin, Cymbalta, and muscle relaxants for her pain. Tr. 47. She takes BuSpar for anxiety. Tr. 47. She takes other medications. Tr. 47. Her medications are helpful, but there are days when her fibromyalgia flares up and medications don't help. Tr. 47–48. She has fibromyalgia flares about every 2 weeks and they last 4 to 5 days. Tr. 48. When asked if she has spoken to her doctor about whether there is anything else that could be done to help with pain during her flare-ups, Pruitt answered that she has. Tr. 48. Her doctor increased her gabapentin dosage to 3 times a day, which helped "to a point." Tr. 48. She believes her body has built up a tolerance for the medication. Tr. 48. When asked if there were other plans for treating her pain more effectively, Pruitt answered that she would have to talk to her doctor about that. Tr. 48. She also plans to ask for a medical marijuana card, because she has heard that's helpful for treating fibromyalgia. Tr. 48–49. She used to smoke marijuana every day and it was "very helpful" for her pain. Tr. 54.

When asked if she had any treatment for her hand issues, Pruitt stated, "Well, usually, a treatment is with a physical therapist." Tr. 49. She described how her tight hand muscles cause problems and that physical therapy helps loosen those muscles. Tr. 49–50.

13

Pruitt said that her mental health medications help. Tr. 50. She's also going through menopause, which, in addition to pain, is "another reason why [she's] so grumpy." Tr. 50.

When asked about her eye problems, Pruitt stated that she has an upcoming appointment with her eye doctor to have an injection. Tr. 51. She receives eye injections every month and her eyes have gotten better. Tr. 51. But she will never have 20/20 vision in her right eye again—the best she can obtain is 20/30 vision, even with glasses. Tr. 51. Sometimes it's hard for her to focus on objects near and far. Tr. 51.

Pruitt has irritable bowel syndrome and must go to the bathroom "constantly." Tr. 52. Her doctor prescribes medicine for her, which helps. Tr. 53. She also has abdominal cramping. Tr. 53. When asked if she sees a specialist, she answered no—"[she] just go[es] [to] see ... Dr. Nichols for the medication." Tr. 53.

Pruitt has a dog and a cat and takes care of them. Tr. 54. She performs personal care tasks. Tr. 54. She tries to help with household chores like sweeping, but she has to take a lot of breaks. Tr. 55. She does some cooking and goes shopping, but she sits down while she shops and her mother or son accompany her to help load groceries in her car. Tr. 55-56. During the day, Pruitt watches television, reads, and plays games on her computer. Tr. 56. She is tired all the time and takes naps. Tr. 56. She visits with family members and sometimes they play card games. Tr. 56, 57. During the hearing, Pruitt was

14

sitting in bed with her feet up. Tr. 60. Having her feet up helped—she sat with her feet up for about an hour a day. Tr. 60.

The ALJ discussed with the vocational expert Pruitt's past relevant work as a laundry cleaner. Tr. 61–66. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Pruitt could perform Pruitt's past work or any other work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 61–62, 66–67. The vocational expert answered that such an individual could not perform Pruitt's past work but could perform the following jobs: office cleaner, mail clerk, and food service worker. Tr. 66–67.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since June 2, 2020, the application date (20 CFR 416.971 *et seq*.).

2. The claimant has the following severe impairments: degenerative disc disease of the cervical spine with a history of discectomy and fusion, degenerative disc disease of the lumbar spine, fibromyalgia, migraines, obstructive sleep apnea, hypertension, branch retinal vein occlusion with macular edema of the right eye, gastroesophageal reflux disease/irritable bowel syndrome, persistent depressive disorder, anxiety, personality disorder, trauma and stressor related disorder, and cannabis use disorder (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

15

4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except: She can occasionally climb ramps or stairs, but can never climb ladders, ropes, or scaffolds. She can occasionally stoop, kneel, crouch, or crawl. She can frequently perform tasks requiring near or far acuity. She must avoid all exposure to workplace hazards such as unprotected heights and moving mechanical parts. She can perform simple routine tasks, but not at a production rate pace (as in assembly line work) and not with strict production quotas. She can interact occasionally with supervisors and coworkers, with no responsibility for sales, arbitration, negotiation, confrontation, conflict resolution, or the safety or welfare of others. She can never interact with members of the public as part of her job duties. She can adapt to occasional changes in the work setting or routine so long as those changes are explained in advance and implemented gradually.

5.  The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.  The claimant was born [i]n January 1967 and was 53 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed (20 CFR 416.963).

7.  The claimant has a limited education (20 CFR 416.964).

8.  The claimant's past relevant work is unskilled and thus there are no transferrable skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.  The claimant has not been under a disability, as defined in the Social Security Act, since June 2, 2020, the date the application was filed (20 CFR 416.920(g)).

Tr. 18–26.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)).

A court may not try the case de novo, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence

supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

**Discussion**

*1.    The ALJ did not err when she evaluated Dr. Nichols's opinion*

Pruitt argues that the ALJ erred when she evaluated Dr. Nichols's opinion. Doc. 9, at 9.

The Commissioner is required to evaluate the persuasiveness of all medical opinions using the following factors: supportability; consistency; treatment relationship, including the length, frequency, purpose, and extent; specialization; and other factors. 20 C.F.R. §§ 416.920c(a), 416.920c(c)(1)–(5). Supportability and consistency are the most important factors. *Id*. at § 416.920c(a). The Commissioner must explain the supportability and consistency factors when discussing a medical opinion. *Id*. at § 416.920c(b)(2). The Commissioner is not required to discuss the remaining factors. *Id*. "A reviewing court evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical

opinion." *Toennies v. Comm'r of Soc. Sec.*, 2020 WL 2841379, at *14 (N.D. Ohio June 1, 2020) (internal quotation marks and citation omitted).

The ALJ detailed Dr. Nichols's findings and opinion. Tr. 24. Then she explained why she found Dr. Nichols's opinion unpersuasive:

> While he treated the claimant, the treatment notes did not document the extreme dysfunction described in his opinion. The claimant did report ongoing pain in her joints and demonstrate pain and limited motion in her lumbar and cervical spine with spasms. However, she also exhibited normal strength, motor function, and sensation. She did not have substantial deficits in her extremities and there was no objective indication of gait impairment. Likewise, the claimant had only intermittent complaints of mental symptoms and she displayed logical thoughts, adequate judgment, and normal concentration and memory. Dr. Nichols' objective findings are incongruent with the limitations Dr. Nichols described. Moreover, Dr. Nichols' treatment of the relevant impairments remained conservative, with prescriptions for medications such as Ibuprofen 800, Gabapentin, and Cymbalta, but without referrals for evaluation or treatment by specialists or any more significant medical interventions.

Tr. 24.

Pruitt contends that the ALJ's reliance upon normal exam findings "was contrary to evidence in the record." Doc. 9, at 11. In support of her argument, Pruitt cites Dr. Nichols's findings that Pruitt had multiple tender points, increased spasm and decreased range of motion in her cervical and lumbar spine, and positive straight leg raise tests. *Id*. But the ALJ acknowledged Pruitt's cervical and lumbar spine spasms and limited range of motion. Tr. 24. Pruitt doesn't dispute that she did, in fact, have normal strength, motor function, and sensation and no gait impairment, as the ALJ observed. So the

ALJ's reliance upon those normal findings was not "contrary to the evidence in the record."

Pruitt cites items in treatment notes from visits with Dr. Nichols, Doc. 9, at 11–12, but many of those items are not objective exam findings. For example, Pruitt says that she was "positive for … [a] gait problem" at a visit in July 2020. *Id*. at 12 (citing Tr. 757). But at that visit Pruitt *reported* having a "gait problem"—Dr. Nichols didn't observe her with a "gait problem." Tr. 757. Pruitt's reported symptoms don't undermine the ALJ's reliance upon Dr. Nichols's objective findings. Pruitt also relies on her testimony to support Dr. Nichols's opinion, Doc. 9, at 12, but the ALJ didn't fully credit Pruitt's reports of symptoms. Tr. 24. And as discussed below, the ALJ did not err when she evaluated Pruitt's reports of symptoms. Finally, Pruitt doesn't dispute the ALJ's accurate statement that Dr. Nichols only provided conservative treatment.

Next, in support of her argument that the ALJ erred when she evaluated Dr. Nichols's opinion, Pruitt cites the opinion of Dr. Haaga, the psychological consultative examiner. Doc. 9, at 13–14. Pruitt doesn't explain what Dr. Haaga's opinion has to do with the ALJ's evaluation of Dr. Nichols's opinion. To the extent Pruitt's asserts a stand-alone challenge to the ALJ's evaluation of Dr. Haaga's opinion, it is improperly placed in a section challenging Dr. Nichols's opinion. In any event, Pruitt's argument that the ALJ erroneously omitted from the RFC assessment the limitations found by Dr. Haaga fails

because Pruitt doesn't show that the ALJ's RFC is inconsistent with the portions of Dr. Haag's opinion that the ALJ found persuasive. Tr. 20, 22–23. And Pruitt doesn't challenge the ALJ's conclusion that Dr. Haaga's opinion was "persuasive in general" but also "vague." Tr. 23.

Pruitt submits that "the ALJ in this matter found that the statement of the treating source was not persuasive and failed to give a coherent explanation for her reasoning as her rationale failed to view the entire record." Doc. 9, at 14. The ALJ's explanation, reproduced above, was coherent and reasonable in view of the entire record, which the ALJ discussed throughout her decision. Tr. 21–25. Pruitt's challenge to the ALJ's evaluation of Dr. Nichols's opinion fails.[10]

2.    *The ALJ did not err when she evaluated Pruitt's reports of symptoms*

2.1   *Waxing and waning symptoms*

Pruitt argues that the ALJ erred because she failed to appreciate "the waxing and waning" nature of Pruitt's symptoms. Doc. 9, at 15. For the next 2 pages, Pruitt regurgitates medical evidence—copied and pasted from earlier passages in her brief—without explaining how those medical records support her argument that she had waxing and waning symptoms that the ALJ

---

[10]    Because Pruitt's challenge to the ALJ's evaluation of Dr. Nichols's opinion fails, Pruitt's related argument that the ALJ erred when she didn't include Dr. Nichols's assessed limitations in the RFC also fails. *See* Doc. 9, at 23–24.

ignored. So Pruitt's argument is waived.[11] *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal citations omitted).

Next, Pruitt argues that the ALJ failed to discuss Social Security Ruling 12-2p, *Evaluation of Fibromyalgia*, which states that an ALJ "will consider a longitudinal record whenever possible because the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'" 2012 WL 3104869, at *6 (July 25, 2012). Doc. 9, at 16–17. Pruitt contends that the ALJ "failed to consider the longitudinal record documenting Pruitt's symptoms as detailed by her treating sources, including complaints regarding fatigue … and pain." *Id*. at 17. But the ALJ considered the longitudinal record. Tr. 21–25. The ALJ observed that Pruitt only had conservative treatment for her symptoms. Tr. 23, 24. She found that Pruitt's intermittent complaints of migraines, irritable bowel symptoms, and hypertension episodes were "largely managed with medication," Tr. 24, a finding that Pruitt does not challenge.

---

[11]    And the symptoms Pruitt describes improved with medical treatment, as the ALJ found. Tr. 21 (emergency room visits resolved with gallbladder surgery), 22 (after treatment, macular edema resolved and new pre-retinal hemorrhage was improving; Pruitt had elevated blood pressure on exam but hadn't taken her medication; hip pain improved with treatment; CPAP improved sleep apnea symptoms). Indeed, Pruitt herself testified that treatment improved her symptoms. Tr. 47–53.

The ALJ also remarked that Pruitt's sleep improved with CPAP treatment and that Pruitt slept better and stopped taking naps during the day. Tr. 22, 24. Pruitt has not shown that the ALJ committed an error as to Pruitt's "fibromyalgia and related symptoms." Doc. 9, at 17.

Pruitt also argues that the ALJ "failed to discuss the frequency of [Pruitt's] headaches in conjunction with Listing 11.02." Doc. 9, at 17. But Pruitt doesn't challenge the ALJ's finding that her headaches were controlled by medication. Tr. 22, 24. So Pruitt hasn't articulated an error that the ALJ made as to her headaches.

### 2.2 Social Security Ruling 16-3p

In a separate section of her brief, Pruitt argues that the ALJ "failed to consider Pruitt's symptoms as required by Social Security Ruling 16-3P." Doc. 9, at 19. To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ considers medical evidence, the claimant's statements, other information provided by medical sources, and any other relevant evidence in the record. *See* SSR 16-3p, 2016 WL 1119029, at *4 (March 16, 2016); 20 C.F.R. § 404.1529. Other relevant evidence include: daily activities; the location, duration, frequency, and intensity of pain or symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication; treatment, other than medication, to relieve pain; any measures used to relieve pain; and "[o]ther factors concerning … functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. §

24

404.1529(c). "The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence." *Hatcher v. Berryhill*, 2019 WL 1382288, at *15 (N.D. Ohio Mar. 27, 2019) (citing *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp.2d 724, 733 (N.D. Ohio 2005)).

The ALJ explained that she discounted Pruitt's reports of symptoms and limitations because Pruitt had conservative treatment, relevant normal exam findings, and medication controlled her intermittent symptoms. Tr. 21, 24–25. So the ALJ considered Pruitt's statements, information provided by medical sources, and treatment, including medication. *See* Soc. Sec. R. 16-3p, 2016 WL 1119029, at *4; *see also* 20 C.F.R. § 404.1529.

Pruitt recites her testimony and information that she and her mother wrote in their function reports. Doc. 9, at 19–20. Pruitt says that evidence "supported the fact that Pruitt had pain issues exacerbated by her migraines and irritable bowel syndrome which interfered with her ability to sustain activities and maintain focus and concentration." *Id.* at 21. But the ALJ disagreed, and Pruitt doesn't identify an error that the ALJ made. And she doesn't challenge the ALJ's evaluation of her mother's function report. Tr. 23 (ALJ explaining that the "extreme limitations" Pruitt's mother described were inconsistent with Pruitt's conservative treatment and the generally normal exam findings in the record of strength, reflexes, ambulation, cognition, thoughts, and behavior).

Finally, Pruitt cites 2 cases, neither of which involved Social Security Ruling 16-3p. Doc. 9, at 21. In any event, those cases—*Lorman v. Comm'r of Soc. Sec.*, 107 F. Supp.3d 829, 838 (S.D. Ohio 2015), and *Aubin v. Comm'r of Soc. Sec*, No. 1:20-cv-2206, 2022 WL 138080, at *12 (N.D. Ohio Jan. 14, 2022)—don't show that the ALJ's evaluation of Pruitt's symptoms was faulty. The ALJ's evaluation of Pruitt's symptoms is supported by substantial evidence, so the ALJ's decision must be affirmed. *See Jones*, 336 F.3d at 477.

Finally, Pruitt contends that the ALJ erred at step 3 of the decision when she cited the fact that Pruitt "was able to follow the proceedings at the hearing and answer questions appropriately" as a reason that Pruitt had only "moderate" limitations in her ability to concentrate, persist, or maintain pace. Doc. 9, at 22 (citing Tr. 19). Pruitt argues that case law says that an ALJ can't deny a claim solely based on the ALJ's personal observations at the administrative hearing. *Id.* (citing *Weaver v. Sec'y of Health & Human Servs.*, 722 F.2d 310, 312 (6th Cir. 1983)). But the ALJ didn't rely "solely on [her] observations at the hearing." *Weaver*, 722 F.2d at 312. The ALJ cited 2 other reasons why she found that Pruitt had moderate limitations in her ability to concentrate, persist, or maintain pace—"[Pruitt] exhibited normal concentration, attention, and memory during consultative exams with no indication of substantial objective deficits in the treatment notes" and handled her own finances, "an activity that can require heightened levels of attention." Tr. 19.

26

The ALJ did not err when she evaluated Pruitt's reports of symptoms.

**Conclusion**

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: January 26, 2023

_/s/ James E. Grimes Jr._
James E. Grimes Jr.
U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019).